IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| THE WIMBLEDON FUND, SPC (CLASS TT), § § | |
| Plaintiff, § § | |
| v. § § | |
| DAVID BERGSTEIN, JEROME SWARTZ, § AARON GRUNFELD, and KIARASH JAM, § § | Civil Action No. |
| Defendants. § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff The Wimbledon Fund, SPC (Class TT) (the "Fund" or "Plaintiff") files this Original Complaint against Defendants David Bergstein ("Bergstein"), Jerome Swartz ("Swartz"), Aaron Grunfeld ("Grunfeld") and Kiarash Jam ("Jam") (collectively, "Defendants") and states as follows:

## I.
## PARTIES

1.   Plaintiff The Wimbledon Fund, SPC (Class TT) is a Cayman Islands segregated portfolio company.

2.   Defendant David Bergstein is an individual who resides and may be served at 5353 Round Meadow Road, Hidden Hills, California.

3.   Defendant Jerome Swartz is an individual who resides and may be served at 6 Lighthouse Point Road, Huntington, New York.

4.   Defendant Aaron Grunfeld is an individual who resides and may be served at 335 N McCadden Place, Los Angeles, California.

5. Defendant Kiarash Jam is an individual who resides and may be served at 514 S. Barrington Avenue, Apartment 302, Los Angeles, California or at his place of business at K.Jam Media, 2425 Colorado Avenue, Suite B205, Santa Monica, California.

## II.
## JURISDICTION AND VENUE

6. The Court has diversity jurisdiction of this controversy pursuant to 28 U.S.C. § 1332(a)(2). The Fund is a foreign corporation and a citizen of a foreign country. As explained below, pursuant to veil-piercing theories, the Fund seeks a judicial declaration that Bergstein, Swartz, Grunfeld and Jam are jointly and severally liable for a Texas corporation's liability arising out of or under a contract entered into with the Fund. Such liability has been adjudicated in a lawsuit in New York state court. The Fund is seeking more than $18 million in actual damages.

7. Venue is proper in the United States District Court for the Southern District of Texas because it is the judicial district in which the Texas corporation has its registered office. *See* 28 U.S.C. §§ 1391(b)(1), (d).

## III.
## BACKGROUND

**A.   The Fund**

8. Founded on or about December 18, 1995, the Fund is a pooled investment hedge fund. Although the Fund was segregated into five (5) separate classes of investment portfolios at all relevant times, the Class TT portfolio is the only one that is relevant to this lawsuit.

9. At all relevant times, the Class TT shares, including all assets derived from the sale thereof (i.e., the Class TT portfolio), were explicitly mandated by the Fund's documents to be exclusively invested, either directly or indirectly, in Tewksbury Investment Fund Ltd. (formerly known as Trout Trading Fund Ltd.) ("Tewksbury"). As is well known in financial

circles, Tewksbury is a premier, multi-billion dollar hedge fund, renowned both for its stability and successful annual returns.

10. Swiss Financial Services (Bahamas) Ltd. was retained to perform the day-to-day administrative management of the Fund, including processing redemption requests and informing the shareholders of the monthly values of the shares of each segregated portfolio. Weston Capital Management LLC and/or Weston Capital Asset Management, LLC (collectively, "Weston") were retained to otherwise manage the Fund, including directing the investment, reinvestment, allocation, and reallocation of each segregated portfolio. Societe Generale Private Banking served as the custodian of the Fund.

**B.   Swartz IP Services Group Inc. ("SIP")**

11. Swartz IP Services Group Inc. ("SIP") was formed as a Texas corporation on December 2, 2010. Upon information and belief, it never had a business address or did any business in Texas. Its registered agent and registered office are located in Houston, Texas.

12. Defendants created SIP for a single purpose: to shield them from personal liability arising from fraudulent conduct directly benefiting them. Upon information and belief, SIP has no assets, it is controlled entirely and exclusively by Defendants, no person other than Defendants has the authority to make any significant decisions with respect to SIP, there was a complete failure to observe any corporate formalities, no management committee was formed, no votes were ever taken on any issues, board of directors meetings were never held, and no minutes were ever taken.

13. Upon further information and belief, Defendants operated SIP as if they and SIP were a single economic entity, i.e., they made no distinction between their personal finances and the finances of SIP, one-hundred percent of SIP's obligations were funded on an as-needed basis solely by Defendants from their personal bank accounts or using funds pilfered from others, and

Defendants regularly siphoned company funds for their own personal benefit and used company offices and equipment to conduct their own personal business.

14. Defendants used SIP to engage in conduct that was unfair, unjust, inequitable, tortious, and fraudulent. Defendants used their position of total control to direct SIP to take actions solely based on Defendants' personal interests.

15. SIP is not a real company. It is a mere fiction. SIP and Defendants are one and the same.

C. **The Note Purchase Agreement**

i. *Terms of the agreement*

16. On or about November 14, 2011, the Fund entered into a Note Purchase Agreement ("NPA") with SIP. Pursuant to the NPA, the Fund had the right to purchase up to $25 million of reference notes (the "SIP Notes") issued by SIP.

17. The NPA contains numerous provisions indicating that SIP was a legitimate business entity and that the SIP Notes were a legitimate investment. The below list contains a few examples of these provisions:

- In Section 5.2, SIP represents and warrants that it is "duly authorized by the appropriate governing body" to execute the agreement;
- In Section 7.1, SIP offers to provide interim and annual financial statements, notices of board of directors meetings, and minutes from those meetings;
- In Section 7.2(a), SIP covenants to "preserve and maintain separate corporate existence and all material rights, franchises, licenses, permits, and privileges sufficient for the conduct of its business";
- In Section 7.2(e), SIP covenants to "maintain a system of accounting, and keep such books, records and accounts sufficient to permit the preparation of financial statements in accordance with GAAP";
- In Section 7.2(g), SIP covenants to make its properties, books, records, and files available for inspection;
- Section 8 explains how the SIP Notes would increase or decrease in value each year based on Tewksbury Investment Fund Ltd.'s performance, plus a premium of 1% thereon, and would become due and payable in full on November 14, 2016;

- Section 10.1 set forth SIP's obligations to satisfy a redemption request; and
- In Section 14, SIP states that the SIP notes may be presented for payment at SIP's office in Santa Monica, CA.

### ii.    *The Fund purchased $17.7 million of SIP Notes*

18. Pursuant to the NPA, in November 2011, $12.5 million from the Fund's Class TT portfolio was used to purchase SIP Notes. In December 2011, an additional $5.2 million from the Fund's Class TT portfolio was used to purchase SIP Notes.

### D.    SIP immediately transferred the Fund's investments out of SIP's bank accounts

### i.    *Transfers from the Deutsche Bank accounts*

19. The Fund's November 2011 investment of $12.5 million was wired to SIP's Deutsche Bank accounts. Through a series of transfers to third parties that are operated by and/or for the benefit of Defendants, nearly half of the investment was transferred out of the accounts within just twelve days of receipt, and the accounts were almost entirely depleted within a mere eight months of the investment. These transfers were entirely inconsistent with the clear and unambiguous terms of the NPA. Some of these transfers are identified in the subsequent paragraphs.

20. There were sixteen transfers to Graybox LLC totaling $1.8 million. Bergstein is that entity's managing member.

21. There were three transfers to Eugene Scher as Trustee for the Bergstein Trust totaling $125,000. The trust owns Bergstein's real property located throughout the country.

22. Mr. Scher is the marketing director of K.Jam Media, an entity owned by Jam. The "business address" for SIP is the same as that for K.Jam Media.

23. Mr. Scher is also the CEO and COO of Cascade Technologies Corp., a Wyoming corporation of which Swartz serves as a director. There was a transfer of $200,000 to Cascade Technologies Corp.

24.  There were sixteen transfers totaling approximately $2 million to Integrated Administration, a California corporation controlled by Bergstein and Jam. Jam is the entity's registered agent.

25.  There were two transfers totaling approximately $2.2 million to FBO Weston Capital Partners Master Fund II Ltd.

26.  There were three transfers totaling $485,000 to the attorney who subsequently represented SIP in the breach-of-contract lawsuit filed by the Fund and has represented Bergstein and his various entities in many other lawsuits throughout the country.

27.  There was a transfer of $1,274,325 to the trust account of an attorney who, upon information and belief, represented Bergstein in matters unrelated to SIP, including fraud claims brought against Bergstein, individually, relating to his involvement in a merger that soon resulted in the bankruptcy of the surviving entity.

28.  A $1,000,000 transfer to an Arkansas investment firm, to which (upon information and belief) Bergstein owed money.

29.  There was a $50,000 transfer to Pineboard Holdings, Inc., a special purpose entity formed by Bergstein weeks prior to the NPA.

### ii.  *Transfers from the Wells Fargo account*

30.  The Fund's December 2011 investment of $5.2 million was wired to SIP's Wells Fargo account. By the end of that month, the account's ending balance was approximately $68,000. By the end of April 2012, the account balance was approximately $17,000. Like the Deutsche Bank account, this account's funds were depleted through transfers to third parties that are operated by and/or for the benefit of Defendants. Some of these transfers are identified in the subsequent paragraphs.

31.  There were two transfers totaling $300,000 to Graybox LLC.

32. There was a $300,000 transfer to "Pineboard Funding," an entity that, upon information and belief, is related to Pineboard Holdings, Inc.

33. There was a $100,000 transfer to Eugene Scher as Trustee for the Bergstein Trust.

34. There were six transactions totaling approximately $2.2 million that are described in Wells Fargo's bank records as "withdrawals made in branch" or "bank originated debit."

35. In December 2013, pursuant to the direction of K.Jam Media, the account received a $50,000 deposit. Three days later, $41,672 was transferred to Broadway 4D Theaters, LLC. SIP previously issued a $15 million credit line to Broadway 4D Theaters. The line was considered to be in default as of September 2013, nevertheless, SIP inexplicably advanced additional funds.

### iii.   *SIP ignored redemption requests and an acceleration notice*

36. Pursuant to the NPA, in August and October 2012, redemption requests were made on SIP. A final redemption request for approximately $4.7 million was made in January 2013. SIP ignored these redemption requests.

37. On February 4, 2013, the Fund declared the SIP notes immediately due and payable. SIP ignored this acceleration notice.

38. On February 8, 2013, the Texas Secretary of State forfeited SIP's certificate of formation pursuant to §171.309 of the Texas Tax Code.

39. On that same date, the Fund sued SIP for breach of contract in New York state court. On July 14, 2015, the New York state Court entered an award against SIP and in favor of the Fund in the amount of $18,171,635.

### E.   **Defendants' roles in SIP**

### i.   *Bergstein*

40. Bergstein is SIP's president and secretary.

41. Upon information and belief, Bergstein is a twenty-five to fifty percent shareholder of SIP.

42. On December 2, 2010, he signed SIP's bylaws as the "duly elected, qualified and acting Secretary."

43. On April 12, 2012, Bergstein e-mailed Albert Hallac, Weston's principal, about needing "one more day if possible" to realize cash for a pending $1 million redemption request.

44. On April 26, 2012, Bergstein authorized Keith Wellner with Weston to give the Fund "[a] rep that as of 3/31/12 the net equity in the SIP accounts was greater than $7.12MM." A review of the bank accounts referenced above indicates that representation was not accurate.

45. On that same date, Bergstein's assistant, using a Graybox LLC domain, e-mailed SIP's bylaws to Keith Wellner with Weston.

46. On June 13, 2012, Bergstein filed a Certificate of Amendment with the Texas Secretary of State changing SIP's name from Swartz IP Services Group Inc. to Advisory Services Inc.

   *ii.   Swartz*

47. Upon information and belief, Swartz is a fifty to seventy-five percent shareholder of SIP.  His shares are recorded on SIP's corporate account opening form with Deutsche Bank.

48. Upon information and belief, Swartz met with Albert Hallac of Weston on or about August 17, 2011, and met with Jeffrey Hallac in early November 2011.  As discussed above, the NPA is dated November 14, 2011.

49. In March 2012, per Bergstein's request, Jeffrey Hallac of Weston e-mailed Swartz several documents regarding the investment strategy for the Fund's Class TT portfolio.  This e-mail was sent approximately three months after nearly the entire Fund's December 2011 investment of $5.2 million had been transferred out of SIP's Wells Fargo account.

### iii.   *Jam*

50. Jam, as SIP's vice president, executed the NPA and the corresponding SIP Notes.

51. On November 17, 2011, Jam, on behalf of SIP, sent correspondence to Weston assuring that $5 million of the Fund's initial investment would remain in cash or liquid investments until the SIP Notes matured or redemptions were requested. A review of the bank records referenced above indicates that representation was not accurate.

### iv.   *Grunfeld*

52. On December 12, 2010, as the sole director of SIP, Grunfeld filed SIP's Certificate of Formation with the Texas Secretary of State.

53. Upon information and belief, Grunfeld is an attorney who represented Swartz IP and has represented, and/or currently represents, Bergstein. In those capacities, Grunfeld has formed several entities used by Bergstein to elude Bergstein's creditors. SIP and some of the transferees of the Fund's investments are believed to be such entities.

## IV.
## COUNT ONE – DECLARATORY RELIEF

54. The Fund re-alleges and incorporates by reference the factual allegations contained in Paragraphs 8 through 53 above.

55. SIP failed to keep its assets separate from those of Defendants (who were SIP's only "officers" and "directors") and to observe corporate formalities. There exists such unity between SIP and Defendants that SIP ceases to be separate and that holding only SIP liable for the breach-of-contract judgment entered in favor of the Fund would promote injustice.

56. Defendants also used SIP as a cloak to defraud investors, including the Fund. That is the only reason the entity was created. SIP never conducted any legitimate business in Texas, and SIP, acting through Defendants, never intended to repay the SIP Notes. As soon as the desired investment was obtained and transferred out of SIP's bank accounts and into the

accounts of entities operated by and/or for the benefit of Defendants, Defendants permitted SIP's existence to be forfeited.

57.     Pursuant to the federal Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq.*, the Fund requests a judicial declaration that Defendants are jointly and severally liable for SIP's liability arising out of or under the NPA.

58.     As evidenced by the underlying breach-of-contract lawsuit, which SIP contested, there is an actual controversy between the parties.

**WHEREFORE**, Plaintiff The Wimbledon Fund, SPC (Class TT) respectfully prays that Defendants be cited to appear and answer herein, and that upon final trial thereof, that the Court:

(a)     Declare that Defendants are jointly and severally liable for Swartz IP Services Group Inc.'s liability arising out of or under the Note Purchase Agreement; and

(b)     Award all such other relief, both special and general, at law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

**COLE SCHOTZ P.C.**


By: /s/ James W. Walker
    James W. Walker (Lead Attorney)
    (S.D. Fed Bar No. 13776)
    (TX Bar No. 20709600)
    Email: jwalker@coleschotz.com
    Justin S. Levy (Attorney to be Noticed)
    (S.D. Fed Bar No. 1373395)
    (TX Bar No. 24078852)
    Email: jlevy@coleschotz.com
    2515 McKinney Ave., Suite 1350
    Dallas, TX 75201
    Telephone: (469) 557-9390
    Facsimile: (469) 553-0361
    Leo V. Leyva (Attorney to be Noticed)
    E-mail: lleyva@coleschotz.com
    James T. Kim (Attorney to be Noticed)
    E-mail: jkim@coleschotz.com
    900 Third Avenue
    New York, NY 10022-1906
    Telephone: (212) 752-8000
    Facsimile: (212) 752-8393
    **ATTORNEYS FOR PLAINTIFF**
    **THE WIMBLEDON FUND, SPC**
    **(CLASS TT)**